Filed 7/28/26  Lackey v. Zohoury CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TOM LACKEY et al., | B343870 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. SC126845) |
| ROBERT BAHRAM ZOHOURY et al., | |
| Defendants and Appellants. | |

APPEALS from judgments and orders of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Affirmed in part and reversed in part.

Vivoli Saccuzzo, Michael W. Vivoli, Jason P. Saccuzzo; Cooksey, Toolen, Gage, Duffy & Woog, Phil Woog and Matthew R. Pahl for Defendants and Appellants Robert Bahram Zohoury, SBZ LP, and SIDMA, Inc.

Vivoli Saccuzzo, Michael W. Vivoli, Jason P. Saccuzzo; Greines, Martin, Stein & Richland, Cynthia E. Tobisman and

Gary J. Wax for Defendant and Appellant Siamak Michael Rahimi.

Mesisca Riley & Kreitenberg, Dennis P. Riley and Rena E. Kreitenberg for Plaintiffs and Appellants.

_____

## INTRODUCTION

Tom Lackey, Sergio Camacho, Chris Crosby, Marianna (Janell) Pillarella, Bernard Yin, Rebecca Ramirez, and Paul Campbell (collectively, the tenants) leased rent-controlled units in a Santa Monica apartment building (the Property). They sued Robert Bahram Zohoury, Siamak Michael Rahimi, and others for an alleged scheme to drive them from their units by undertaking wide-ranging construction at the Property while the tenants lived there.

The tenants asserted tort and contract causes of action and claims under the Civil Code and the Santa Monica Municipal Code (SMMC). Trial proceeded against Zohoury, Rahimi, and two business entities related to Zohoury called SBZ, LP (SBZ) and SIDMA, Inc. (SIDMA). A jury awarded the tenants approximately $19 million in compensatory damages, civil penalties, and punitive damages. Finding the damage award excessive, the trial court granted a conditional new trial as to damages unless the tenants accepted a remittitur to $9 million. The tenants accepted the remittitur.

Zohoury, Rahimi, SBZ, and SIDMA (defendants) now appeal the judgment. Rahimi additionally appeals the denial of his motion for judgment notwithstanding the verdict (JNOV). The tenants cross-appeal the order granting a new trial.

2

We find no merit to the appeal by Zohoury, SBZ, and SIDMA, and affirm the judgment as to them. We conclude no substantial evidence supports the jury's finding of liability on some of the claims against Rahimi, and that the trial court prejudicially erred in instructing the jury as to the remaining claims against him. We therefore reverse the judgment against Rahimi, direct the trial court to grant JNOV on those claims not supported by substantial evidence, and order a new trial on the remaining claims against him.

We also conclude the trial court did not err in granting a conditional new trial and thus reject the tenants' cross-appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.     The Property and the Parties**

The Property is located at 1647 Ocean Front Walk in Santa Monica. It has three floors and 17 units.[1] The Property is subject to Santa Monica's rent control ordinance (City of Santa Monica Charter, art. XVIII), which limits the rent paid by tenants.

Zohoury purchased the Property in August or September 2013 and placed title with SBZ. SBZ was a limited partnership; SIDMA, a California corporation owned by Zohoury and his sister, was the general partner and Zohoury was a limited partner.

---

[1] Units 1 through 6 are on the first floor, units 7 through 12 are on the second floor, and units 14 through 18 are on the third floor; there was no unit 13.

When Zohoury purchased the property, eight of the units were unoccupied and the tenants lived in five of the units.[2] Lackey was in unit 8, Campbell[3] in unit 9, Crosby and Pillarella in unit 7, Camacho in unit 14, and Yin and Ramirez in unit 17.

In November 2013, Zohoury and Rahimi created a limited partnership, 1647 Ocean Front, L.P. (1647 OFLP); the general partner was Platinum Holdings, LLC, which Zohoury owned, and Zohoury and Rahimi were limited partners. Zohoury and Rahimi testified at trial that they planned to transfer ownership of the Property to 1647 OFLP. As discussed further below, there was conflicting evidence whether 1647 OFLP ever actually obtained title to the Property.

At the same time 1647 OFLP was formed, it entered a "[m]anagement [a]greement" with Rahimi related to the Property. Rahimi testified that he assigned his right to manage the Property to his company, Westside Investments, Inc. (Westside). He also testified that 1647 OFLP "later on was pretty much handling all the transactions day-to-day, collecting rents, and spending the money," and that 1647 OFLP managed the Property utilizing Westside employees. Michelle Hohman and Barbara Ertefai were two of those employees.

---

[2] The residents of the remaining four units are not party to this appeal.

[3] Campbell passed away during the litigation and his wife, Linda Delp, was substituted in as his successor.

4

## B.   The Construction

### 1.   *A handyman works on one unit and a contractor is later hired*

In late December 2013 or early January 2014, Zohoury hired an unlicensed handyman to renovate unit 6. Unit 6 is on the first floor of the Property and at the time this construction began none of the units on the first floor was occupied.

In about February of 2014, Rahimi negotiated a contract with Victor Westin to demolish and renovate unit 3. In early April 2014, the City of Santa Monica (city) found out that Westin was working without a permit and cited SBZ. On April 24, 2014, Zohoury obtained a permit for Westin's work in unit 3.

Rahimi negotiated a second contract with Westin in April 2014 to replace all the windows at the Property, including for the occupied units. Zohoury obtained a permit for this work.

Rahimi negotiated another contract with Westin in April 2014 to renovate vacant units 5 and 12. The city issued a permit to Westin on April 25, 2014 for work in unit 12.

On May 27, 2014, Lackey took photographs of unit 5 which showed it had been stripped down to the framing, the flooring had been removed, and wood debris was strewn about. On June 2, 2014, Westin obtained a permit for work in unit 5.

On June 3, 2014, after the city found out that Westin had been working in units 2, 6, and 10 without a permit, Zohoury obtained permits for the work. That same day, Rahimi negotiated a contract with Westin to plaster the walls in the hallways and install LED lights. The plaster started cracking, so Westin later put up drywall.

On June 12, 2014, Zohoury obtained a permit for replacing the exterior stucco. On June 20, 2014, the city building and

safety division issued a stop work notice. The city ordered that the Property be tested for asbestos, and that permits be obtained for various aspects of the construction, including for scaffolding which had been erected on the outside of the building. In addition, the city building and safety division determined that the building was undergoing more than 50 percent renovation, which meant that sprinklers needed to be installed throughout the interior.

2.      *Asbestos, lead, and mold are found at the Property*

A city inspector informed Zohoury that he needed to test for mold, lead, and asbestos. Zohoury hired Jonathan Massey to do the testing.

Massey issued reports in early July 2014 which found dangerous levels of lead dust in units 2, 5, 10, and 12, and in the hallways on each floor. Massey concluded that renovation work in units 5 and 12 disturbed lead-containing paint, and workers tracked the lead dust from those units into units 2 and 10, which had been used for construction storage.

Massey found that the disturbed stucco and plaster in the building tested negative for asbestos. He did find asbestos in insulation for a vent pipe in unit 5 and in linoleum flooring in one of the other unoccupied units. Massey recommended a plan to abate the asbestos in unit 5 because asbestos-containing material had been disturbed within the unit; the plan had to be submitted to the Air Quality Management District (AQMD) for approval.

Massey found elevated moisture levels in units 5 and 12 in the ceiling joists, wood framing on the walls, and the subfloors, and recommended that a licensed contractor certified for mold remediation address the issue. Massey also found elevated

6

fungal spore concentrations in unit 10, and in the second and third floor hallways.

Zohoury hired a company to clean up the asbestos. Massey monitored the abatement. The abatement process utilized HEPA vacuums, negative air machines, and decontamination chambers. Massey concluded that there was no observable asbestos in the property as of July 11, 2014.

### 3. *A second contractor is hired*

In January 2015, Rahimi negotiated a contract with Hugh Construction & Development (Hugh Construction) to remodel four units.[4]

On July 23, 2015, Hugh Construction obtained separate permits to remodel units 1 and 18 to add a washer/dryer and upgrade the electrical panel.

### 4. *The city orders the tenants to be relocated due to compromised fire safety*

On October 9, 2015, the city division of building and safety ordered SBZ to temporarily relocate the tenants because construction had compromised fire security in the building. The tenants were relocated for about 30 days.

While the tenants were relocated, Massey tested for asbestos, lead, and mold, and the test results were provided to the city. Massey found lead-contaminated dust in unit 16 on October 19, 2015.

---

[4] The contract originally called for Hugh Construction to renovate six units and work on the interior hallways; the scope of the contract may have been reduced because Westin returned to do some of the work.

### 5. *A third contractor is hired*

In June 2016, Rahimi negotiated a contract with V10 Construction. On June 21, 2016, V10 Construction obtained permits to remodel units 4 and 15.

### 6. *A fourth contractor is hired*

Zohoury hired Mighty Contractors in October 2019 to remodel unit 16; the contractor obtained a permit for the work on October 23, 2019. Mighty Contractors also worked on unit 9, which was adjacent to Pillarella's and Crosby's unit, and a portion of the drywall in their unit was punctured during the work.

### C. The Santa Monica Rent Control Board Grants the Tenants' Petitions to Reduce their Rents

Between June 30 and September 4, 2014, each of the tenants filed a petition with the Santa Monica Rent Control Board (Board) seeking reduction of their rent under the city's rent control law.[5] A Board hearing officer held nine hearings from July 2015 through January 2016.

On August 16, 2016, the hearing officer issued a lengthy written decision ordering the tenants' rent to be reduced due to construction-related impacts on the tenants' units and the Property as a whole.

Zohoury himself appealed the hearing officer's decision to the Board, which upheld the decision. We provide additional details of the Board's proceeding in our discussion below of the role its decision played in the trial.

---

[5] Yin filed a petition for the unit he shared with Ramirez; Ramirez did not file her own petition.

**D. The Tenants Sue**

On December 20, 2016, the tenants sued Zohoury, Rahimi, SBZ, 1647 OFLP, SIDMA, Westside, Hohman, Westin, and Hugh Construction. Because this appeal involves only Zohoury, Rahimi, SBZ, and SIDMA, we do not summarize the proceedings involving others except as necessary for context. The tenants asserted various claims including, as relevant here, nuisance, premises liability, negligence, breach of lease, tortious breach of the warranty of habitability, violations of SMMC parts 4.36.100 and 4.56.020, intentional influence to vacate in violation of Civil Code section 1940.2, and intentional infliction of emotional distress (IIED). The tenants sought statutory, economic, and noneconomic damages; civil penalties; restitution; punitive damages; and attorney's fees.

The tenants alleged that their rents were below market because they were subject to the rent control ordinance. Zohoury and Rahimi devised a plan to purchase the Property and then "drive the tenants from [it], rehabilitate [it] and" obtain higher rental income or sell the Property at a profit because of the higher rental income stream. To remove the tenants, Zohoury and Rahimi, along with the other defendants, engaged in construction activities which created "deplorable" and "extremely unhealthful conditions."

**E. The Court Holds that 20 Findings Made by the Board Would be Given Preclusive Effect**

Before trial began, the parties litigated whether findings made by the Board hearing officer in her decision granting the tenants' rent reduction petitions would be deemed established at

9

trial under the doctrine of issue preclusion.[6]  That litigation began when Rahimi and Zohoury filed a motion in limine to exclude on hearsay grounds evidence of the Board decision.  They contended that issue preclusion did not apply to the hearing officer's findings because the Board proceeding did not follow formal evidentiary rules, involved a limited claim with different elements and remedies than the claims in the litigation, and did not provide them with a full and fair opportunity to defend against the tenants' claims because of a lack of discovery and testimony from retained expert witnesses.

The tenants opposed the motion and argued that issue preclusion did apply.  They disputed that defendants were unable to obtain discovery and contended that the Board proceeding included testimony under oath, cross-examination of witnesses, documentary evidence, and the right to be represented by counsel.  The tenants contended that their claims for rent

---

[6] The terms "issue preclusion" and "collateral estoppel" are interchangeable; the parties and trial court used "collateral estoppel" but we will use "issue preclusion."  (*Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477, 481.)  The doctrine "precludes relitigation of issues argued and decided in prior proceedings" if five elements are present:  "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.  Second, this issue must have been actually litigated in the former proceeding.  Third, it must have been necessarily decided in the former proceeding.  Fourth, the decision in the former proceeding must be final and on the merits.  Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding."  (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. omitted.)

abatement before the Board "involve[d] alleged illegal construction and . . . the effect it had on the conditions of the tenants' units." The tenants also filed their own motion in limine for an order that 65 specific findings by the Board "ha[d] been proven" and could not be controverted. They relied on the hearing officer's decision and transcripts of the hearings.

Defendants opposed the tenants' motion. They reiterated their previous arguments against issue preclusion and contended that applying the doctrine would be unfair because they lacked a strong incentive to defend the tenants' claims for rent abatement. Defendants further pointed out that the tenants were seeking punitive damages in the civil action, which were required to be proven by clear and convincing evidence, but the Board's findings were made under the preponderance of the evidence standard. Lastly, the defendants other than SBZ contended that the Board only had jurisdiction over the "landlord" of Property, which was SBZ, and they were not in privity with SBZ.

On February 24, 2022, the trial court (Hon. Mark H. Epstein) issued a tentative ruling granting the tenants' motion to apply issue preclusion. The court found that "[the Board's] decision had a sufficiently 'judicial' character," noting that the Board received testimony under oath, "[t]he parties could also subpoena, call, examine, and cross-examine witnesses," "[t]he hearing's purpose was to determine certain historic facts . . . and then apply the law to those facts to determine the ultimate question concerning rent," the parties could submit documentary evidence, there was a record of the proceeding, "and a well-reasoned and thoughtful decision by the [h]earing [o]fficer that addresse[d] the wealth of submitted evidence and applie[d] it to the controlling legal standards." The tentative ruling solicited

11

further briefing from the parties as to which specific findings by the Board the court should afford preclusive effect. Lastly, the tentative ruling concluded that Zohoury and Rahimi were in privity with 1647 OFLP, which the court found to be the respondent in the Board proceeding.

On March 7, 2022, the tenants filed a brief identifying 48 specific Board findings they contended were subject to issue preclusion.

After hearing argument and receiving further briefing, the court issued an order that issue preclusion would apply to 20 specific findings made by the Board. The court further held that Zohoury, Rahimi, SBZ, and SIDMA would be bound by the Board's findings. The court concluded that Zohoury and Rahimi were in privity because "both seem to have a current or past ownership interest in [1647 OFLP] such that the [Board]'s determination would have a financial impact on both and they may well have worked together in the decision-making process and (by extension) in the defense of the administrative action." The court also found that Rahimi had an "ownership interest" for purposes of privity by virtue of the management agreement for the Property.

On November 28, 2023, the court reassigned the case to Judge David J. Cowan for trial.

On January 5, 2024, the defense filed a renewed motion in limine to exclude evidence of the Board's decision. The defendants contended that the newly assigned trial court was not bound by the prior ruling applying issue preclusion and reiterated the arguments they had previously made. On February 9, 2024, the trial court denied the motion, primarily on

12

the ground that an in limine ruling could only be reconsidered based on new information presented at trial.

## F. Trial

Trial commenced on July 9, 2024.

### 1. *Jury instruction on facts deemed proven*

Zohoury, Rahimi, SBZ, and SIDMA objected to instructing the jury that the 20 Board findings were true as to all defendants. Rahimi contended such an instruction was improper because "[he] ha[d] actually never held an interest in the property." The court overruled the objection. Before opening statements, the court instructed the jury that 20 "facts have been deemed proven already" and that the jury "must accept these facts as true."

The 20 Board findings, which we set forth in full in an Appendix, established the following:

"[T]he owner" failed to test for asbestos until June 23, 2014, after being ordered to do so by the AQMD. "The asbestos was not cleared until July 11, 2014." "The owner did not conduct testing for the presence of lead until July 1, 2014." Testing found " 'dangerous levels of lead dust' in various units and common areas and recommended remediation and decontamination" and "also found lead-based paint and dangerous levels of lead-bearing substances in various units and common areas and recommended remediation and decontamination." "Lead testing was done again on May 28, 2015 by the [Los Angeles] County Public Health Department [(County)] based on a complaint by tenants. Dust samples were again found to contain hazardous levels of lead although no hazardous levels were found in soil or deteriorated paint. Dust hazards were found in vacant Unit 2 and in the first floor hallway. After cleaning, the Unit 2 interior floor failed

13

clearance and the owner was ordered to clean it again.  Clearance was passed the second time and the complaint was closed on August 13, 2015."  "In September 2015, the County received another complaint about unsafe lead work practices causing excessive dust in the building.  An inspector observed visible dust in the common areas and took samples from the common areas and from all the occupied units.  Testing showed dust hazards above the regulatory limit in Unit 16."

Because of "the owner's" failure to obtain permits, do testing and "use safe work practices," the tenants were exposed to "hazardous levels of asbestos" and lead dust, which "put the tenants at risk of respiratory and other ailments"; these exposures "[were] caused by unnecessary upgrades to the vacant units and common areas rather than by necessary repairs or maintenance."  "The dust at the property was primarily generated by the work in the common-area hallways and by the demolition of the eight vacant units."  Because the new floors in the hallways were higher than the floors inside the units and nothing had been installed to close the gap under the unit doors, dust blew into the units.  "[D]ust and odors significantly affected tenants' ability to breathe and spend time in their units and negatively affected their health.  The dust impacted and continued to impact the tenants from June 30, 2014 through the completion date for the construction."  "The negative impact of noise and vibrations on the tenants was significant, affecting their ability to sleep, concentrate and work, and sometimes driving them out of their units."  All of these conditions "interfered with the habitability of [the tenants'] units."

14

2.    *Zohoury*

Zohoury testified he asked Rahimi "to take over and manage the property" and Rahimi "was in charge of construction and in charge of the building." Westside directed Westin's work, although Zohoury would also give direction if he saw an issue. Gabriella Majoros, who worked for Rahimi, prepared plans for Westin to follow. Zohoury understood the plan for each of the units being renovated was to take out the wall separating the kitchen to make the kitchen and living room one open space. Zohoury acknowledged personally obtaining several construction permits, as summarized above.

Zohoury understood that if he relocated the tenants during construction, it would involve extra expense and the tenants would be entitled to the prior rent schedule when they moved back in.

Westin contracted in April 2014 with Westside to sandblast the building and apply stucco. The sandblasting never took place. The city told them that they would have to relocate the tenants if they sandblasted away the old stucco.

Rahimi fired Westin after Rahimi and Zohoury talked about it; they decided to fire Westin because of his poor performance and failing to obtain permits.

One plan in March 2014 was to turn the Property into short term Airbnb rentals, but there were other plans as well.

In April 2015, Zohoury signed escrow instructions to sell the Property. The agreement required remodeling of the Property (including all its units) and stated, "Property shall be delivered vacant with exception to short term lodging agreements not subject to Santa Monica Rent Control." The buyer did not follow through with the transaction. Rahimi was not involved in

15

this proposed deal because he was out of town but Zohoury probably called him about the price.

When 1647 OFLP was formed Zohoury considered himself to be partners with Rahimi on the Property. Zohoury testified that 1647 OFLP acquired title to the Property and that he recalled seeing a deed.[7] About two months after Zohoury purchased the Property, Rahimi took over managing the property through Westside.

### 3. *Peter Savino*

Peter Savino was retired from the city rent control department where he had worked for 33 years, mostly as a hearing investigator. Savino visited the Property 13 times from June 22, 2014 through July 20, 2016 and documented his observations of the construction in reports to the Board's hearing officer. In June and July 2014, Savino observed there was no containment of dust from the areas under construction and the Property was dusty. Savino authenticated photographs he took which depicted the ongoing construction, including construction debris in a patio area, hallways with bare drywall, stairways with damaged railings and exposed nails, and holes in walls, floors, and ceilings.

### 4. *Rahimi*

On November 18, 2013, Rahimi entered a management agreement with 1647 OFLP regarding the Property, which provided that "Rahimi or his assignee will have the sole right to manage the [P]roperty," which "will only terminate upon the sale

---

[7] As noted below, Rahimi testified that 1647 OFLP never owned the Property. No deed was put into evidence showing that 1647 OFLP ever acquired title to the Property.

16

of the [P]roperty to an entity or person that is in no way associated with [1647 OFLP] and/or its partners.  Neither the general partner nor a majority vote will have the authority to terminate Rahimi's right to manage the Property."  Under the agreement, Rahimi or his assignee was entitled to 10 percent of the net operating income as well as 10 percent "of the profit" from any sale of the Property, "calculated as . . . selling price minus acquisition price minus depreciation."  The agreement stated that 1647 OFLP "owns" the Property.

Rahimi is the sole shareholder of Westside.  When asked whether Westside was his assignee of the management agreement, Rahimi responded, "In a way" and clarified that 1647 OFLP "later on was pretty much handling all the transactions day-to-day, collecting rents, and spending the money."  1647 OFLP managed the Property, utilizing Westside employees.  Rents from the Property were deposited into a bank account owned by 1647 OFLP.

Rahimi testified that 1647 OFLP never acquired title to the Property as he and Zohoury had planned.  Rahimi authenticated his signature on a change of ownership registration form submitted to the Board on May 7, 2014, indicating that 1647 OFLP was 100 percent owner of the Property as of November 13, 2013.  The same form was submitted to the Board on June 11, 2014, to add that Rahimi was a limited partner in the partnership and include the date of his signature.  Rahimi also authenticated his signature on an August 28, 2015 change of mailing address form filed with the Board for the Property indicating that Zohoury was a 75 percent owner and Rahimi was a 25 percent owner; these percentages matched the shares each held in 1647 OFLP.

Rahimi testified it was not his decision to demolish and redo the vacant units, stating, "[he] was a limited partner . . . in an operating company" and would follow whatever the owner wanted to do.

Rahimi recommended "to the owner" that all of the tenants be relocated during the construction. Rahimi also recommended to Zohoury to "Ellis" the building, by which Rahimi meant to get out of the rental business for two years and remodel the building, and then be obligated to rent the units to the former tenants at the previous rates. Rahimi understood Zohoury did not want to take that approach because he could not afford to go without rent for two years.

Before the renovation project began in 2014, Majoros had prepared floor plans for the work. Rahimi approved the plans and then "confirm[ed] it with [the] owner." The proposed plan for each unit was to move the bathroom and make it smaller. Majoros was an employee of O Hotel, Inc. but would work for Rahimi on other projects.

Rahimi found three contractors for the construction at the Property and negotiated the contracts with them, although the scope of work "[had] to be confirmed with the ownership," which was SBZ and its general partner, Zohoury. It was Zohoury's obligation to have the Property tested for asbestos. Rahimi understood that the city was in control and would ensure that dust from the construction would be limited; the city was very involved in the project and Rahimi relied on that and the contractor. Rahimi did not look at any of the permits.

Unoccupied units at the Property were rented out through Airbnb for at least a month at a time in accordance with Santa

Monica law; Westside had an Airbnb account so it received the money from Airbnb and then paid 1647 OFLP.

Rahimi found out about the possible sale of the Property in April 2015 after the contract had been signed.

  5. *Pillarella*

Pillarella was 84 years old.  She and Crosby moved into the building in around 2004.  After about a year on the first floor in unit 4, they moved to unit 7 on the second floor.

On June 18, 2014, Pillarella submitted a letter to the Board complaining about conditions at the Property; she copied Westside.  Pillarella indicated there was scaffolding outside her unit which interfered with her privacy, the hallways were "being torn up," water was turned off "many times every month," and there was "dirt and dust . . . everywhere."  (Capitalization omitted.)  Pillarella had earlier complained to Hohman that the Property was "in total disarray" (capitalization omitted) and stated she was experiencing respiratory problems because of the dust.  Pillarella demanded compensation and for her unit to be cleaned.

Pillarella, who had a lung removed years earlier, was having trouble breathing because of the construction dust.  The workers left debris and trash on the porch of unit 12 which the tenants had to pass to enter the building.

In late April 2014, Pillarella and Crosby were starting to have headaches and nausea, and she was having stomach problems.  Crosby's health had been good, but he started shaking and having respiratory problems.  Pillarella would go to her son's house during the weekends to get away from the Property.

The workers left the doors to the Property open, which concerned Pillarella because someone might come in.  Scaffolding

19

was still up in September 2014.  Pillarella saw people using the scaffolding to get into the building.  People peered into her unit from the scaffolding, and she was afraid that someone might enter her unit.

By June 2014, the water would go off in the morning or there would be no hot water.

Pillarella took photos on June 1 and 19, 2014, which show construction in the hallways.  The work in the hallways created dust and an unpleasant smell.

Pillarella noticed bugs and mice at the Property which she had not noticed before.

During the construction of the unit below hers, Pillarella noticed nails coming up through the floor of her unit.  Dust also came through the floor into her unit.

In around September 2015, Pillarella met with Zohoury and asked to be relocated during construction, but Zohoury refused.

In November 2019, during construction on unit 9, next to Pillarella's unit, a part of the ceiling from Pillarella's unit fell into the bathroom sink and there was dust in Pillarella's unit.  At this time Pillarella experienced pest problems again.

Crosby moved out in December 2019.

6.  *Yin*

Yin lived in unit 17; he moved into that unit in 1995.  He and Ramirez met in 2005, and Ramirez moved in with Yin around May or June of 2014 after they married.

In June 2014, the floors in the hallways were dusty and the walls were in "disrepair."  Yin heard "[e]xtremely loud" noise from a tile saw used by the workers.  Yin was fearful during the construction because people would enter the building due to lack

of security.  Noise, dust, and construction materials strewn about made it unpleasant to live at the Property.  Rodents were in his unit after the construction began.  Water was frequently shut off during the construction; power was sometimes shut off or unreliable.

On March 19, 2016, Yin e-mailed Hohman to complain about noxious fumes which made it difficult to breathe.  Yin experienced these types of fumes on more than one occasion.

Yin authenticated a video recording from August 2016 which included noise from the construction which he could hear from his apartment.

Renovation work in unit 9 in 2019 and in unit 11 in 2020 caused noise and dust.  In December 2019, Yin complained to management about dust and water being shut off.  On February 24, 2020, Yin complained again about the workers failing to clean up the dust before leaving.

As a result of the construction, Yin and Ramirez suffered from eye irritation, respiratory problems, and stress.

7.    *Lackey*

Lackey was born in 1952.  Lackey moved into unit 8 in 1991.

Before the construction Lackey was healthy.  Lackey first noticed the construction by the dust.  Dust was coming up from unit 2 through the floor of his unit.  On May 27, 2014, Lackey took photographs of the construction in unit 5, which showed that the unit had been completely stripped to the framing.  Lackey did not see any plastic sheeting or other efforts to contain the dust.

The dust was so bad that Lackey moved out in June or July 2014.  He stayed out of his unit for two and a half years but

continued to pay rent.  He did not want to return because his carpet was full of dust.  The management did not replace the carpet until 2017, after the city ordered it to be done.

Lackey moved out of his unit again in 2019 because the construction was creating dust.  Lackey experienced respiratory and sinus problems.  Lackey was out of his unit for about another six months.

8.    *Crosby*

Crosby was 82 years old at the time of trial.  He moved out around 2019.  When the construction workers were cutting tile for the hallway there was a lot of dust.  Dust could come into his unit underneath the door.  Homeless people slept on the scaffolding and broke into apartments.  Before the construction there had never been problems with vermin or insects, but that changed after the construction began.

In September 2015, Crosby obtained a letter from his doctor stating it would be in his best interest health-wise to live somewhere else during the construction; Crosby handed the letter to Zohoury at a Board hearing.

In June 2014, Crosby's lungs and sinuses were bothering him, and he "had colonies of dust mites in [his] eyes."  In 2015, Crosby was coughing and having trouble breathing, and twice had pneumonia; he was seeing a pulmonary doctor.  In December 2015, Crosby suffered a heart attack.

In 2019, during the construction in unit 9, the workers broke into the back of Crosby's closet.  In addition, a piece of ceiling fell into the sink while Crosby was on the toilet.

9.    *Ramirez*

Ramirez moved into Yin's unit in late May or early June 2014.  It was stressful being in the building during the

22

construction. Ramirez was scared because the building was not secure, and she was concerned about people using the scaffolding to enter the building. It was impossible to keep the dust out of their unit during the construction. Ramirez was concerned because the building was very old and might contain hazardous materials such as asbestos and lead. When Ramirez learned that the tenants had been exposed to lead and asbestos it caused her stress, anxiety, and anger.

10.  *Delp*

Delp married Campbell in 1998. Campbell had moved into the building in 1987 and lived in unit 9. Delp did not live at the Property because she and Campbell maintained separate residences.

Campbell was an acupuncturist and stayed in his unit during the construction because he had a library of acupuncture books which he consulted; he would sometimes stay at Delp's apartment.

During the construction Delp noticed that Campbell had more nosebleeds and nose congestion, and throat and eye irritation. Campbell started taking allergy medication.

Campbell suffered a cardiac arrest in December 2014. He died on August 24, 2017.

11.  *Camacho*

Camacho moved into unit 14 in May 2012.

The construction was very loud and created a lot of dust. Camacho suffered from anxiety and had to leave his apartment during the day to avoid the construction.

Camacho developed a throat infection in 2015. When the infection did not go away, he was put on a course of steroids and antibiotics for 12 or 13 days and then had surgery to remove his

23

tonsils and adenoids. Camacho paid $10,000 out of pocket for the treatment. Camacho's doctor told him he needed his tonsils and adenoids removed because of severe obstructive sleep apnea, which was caused by his weight. Camacho did not ask his medical providers whether conditions at the Property caused his throat condition.

12. *Franco Seif*

Franco Seif, the tenants' hazardous materials expert, opined that the construction did not follow proper practices to contain hazardous materials.

Seif noted that Massey's results showed a wide variation in lead levels and Seif "suspect[ed]" that Massey did not include all of the layers of paint in his samples, which can fail to detect lead present in interior layers of paint. In older buildings such as the Property, the paint almost surely contains lead because lead-free paint was not available.

Based on Massey's test results, Seif testified, "if [the] walls [in the first floor hallway] were scraped without using proper engineering controls, with the levels of lead found in the paint, it [was his] expert opinion that . . . people who walked around these hallways were being exposed to lead."

Seif "probably would have recommended" relocating the tenants at the beginning of construction had he been consulted.

13. *Dr. Gary Richwald*

The tenants' medical expert, Dr. Gary Richwald, is an expert on health issues related to substandard housing. He interviewed tenants from four of the units in August 2020, viewed the Property, and reviewed materials related to the construction, deposition transcripts, and the tenants' medical records. He opined that conditions at the Property caused health

24

problems experienced by the tenants.  For all tenants, this included eye irritation, sinusitis, frequent sore throats and upper respiratory tract infections, coughing, allergies, sleep problems, anxiety, anger, and fear.  Some of the tenants also suffered from additional problems such as rashes, nausea from odors, bronchitis, asthma, headaches, heartburn, loss of appetite, weight loss, and depression.  Lackey suffered from memory loss.  Camacho suffered from ear problems, and Richwald opined that the surgery to remove Camacho's tonsils and adenoids "had to do with exposures and immune response," explaining that "the dust and other – and cockroaches, other sorts of things" would cause inflammation in the tonsils and adenoids "and one approach to handling that is to surgically remove them."  Crosby suffered from pneumonia.

Richwald developed a model for determining average health costs for various ailments over a 10-year period.  Based on his model, Richwald opined that the 10-year medical cost for conditions caused by the construction was $31,000 for Lackey, $22,000 for Yin, $20,000 for Ramirez, $45,000 for Crosby, $36,000 for Pillarella, and $33,000 for Camacho.

On cross-examination, Richwald agreed that he had not physically examined any of the tenants, that his medical costs model was "theoretical by definition," and that he did not review any medical billing records.

14. *Larry Gliko*

Larry Gliko, the tenants' construction expert, testified that for a project like the one undertaken at the Property he would have advised the owner to hire an industrial hygienist to test for mold, lead, and asbestos and to prepare a hazardous substance abatement protocol for the construction contractor to follow.  An

industrial hygienist might have recommended relocating tenants during construction. Gliko opined that he would have recommended the tenants be relocated during the construction, stating, "They never should have allowed these people to stay in these units and go through that on a daily basis with all the dust and debris and contaminated air." Gliko testified that contractors have to be certified to deal with mold, lead, and asbestos. Based on his documentary review, Gliko opined that the contractors failed to follow proper procedures to contain dust.

15. *Massey*

Defendants' expert Massey testified about the testing he performed at the Property for asbestos, lead, and mold, and the abatement process utilized to remove the hazardous materials he had found, as described above.

16. *Dr. Harry Skalsky*

Defendants' toxicology expert, Dr. Harry Skalsky, testified that because Massey's testing did not reveal any asbestos in dust "it would be unlikely that exposures would take place of any consequence" and he did not believe that any asbestos fibers were released into the air. Skalsky opined that Massey's testing revealed a "very low amount of lead" and "even though some were over regulatory limits, those limits are set with a very conservative, by a very conservative methodology that would say exposure probably is not going to be of consequence."

**G.    The Verdict Form and Damages Sought by the Tenants**

If jurors found liability, the verdict form asked them to indicate, for each tenant, the amount of three types of awards:

"[p]ast economic loss," "[p]ast non-economic loss," and "[p]enalties."

With regard to penalties, as previously stated, the tenants' claims included ones for violations of SMMC parts 4.36.100 and 4.56.020, and Civil Code section 1940.2.

Under SMMC part 4.36, "Any landlord who fails to provide [required] relocation assistance . . . shall be . . . liable in a civil action to the tenant to whom such assistance is due for damages in the amount of the relocation fee the landlord has failed to pay, a civil penalty in the amount of five hundred dollars and reasonable attorneys' fees and costs as determined by the court." (*Id.*, pt. 4.36.090, subd. (b).)

SMMC part 4.56.020 prohibits a "landlord" from engaging in various conduct "in bad faith," including, "[i]nfluenc[ing] or attempt[ing] to influence a tenant to vacate a rental housing unit through fraud, intimidation or coercion," and "[i]nterfer[ing] with a tenant's right to quiet use and enjoyment of a rental housing unit as that right is defined by California law." (*Id.*, subds. (f), (j).) At the time of trial, SMMC part 4.56.040, subdivision (d) provided, in relevant part, "Any person who violates or aids or incites another person to violate the provisions of [SMMC part 4.56.020] is liable for each and every such offense for the actual damages suffered by an aggrieved party or for statutory damages in the sum of between one thousand dollars and ten thousand dollars, whichever is greater . . . . Any violator shall be liable for an additional civil penalty of up to five thousand dollars for each offense committed against a person who is disabled or aged sixty-five or over."

As relevant here, Civil Code section 1940.2, subdivision (a)(3) provides that a "landlord" can be held liable for "menacing

27

conduct constituting a course of conduct that interferes with the tenant's quiet enjoyment of the premises . . . that would create an apprehension of harm in a reasonable person." A tenant who prevails under the statute "is entitled to a civil penalty in an amount not to exceed two thousand dollars ($2,000) for each violation." (*Id.*, subd. (b).)

## H.    The Jury's Verdict

On August 5, 2024, the jury rendered verdicts in favor of each of the tenants, finding Zohoury, Rahimi, SBZ, and SIDMA liable on all claims. The jury awarded the tenants a total of $5,789,939 in damages, comprised of $2,000,939 in past economic loss, $1,525,000 in past non-economic damages and emotional distress, and $2,264,000 in civil penalties.[8]

---

[8] The award was broken down among the individual tenants as follows: $701,440 for Yin ($229,440 for past economic loss, $250,000 for past non-economic loss, and $222,000 in civil penalties); $960,653 for Crosby ($203,653 for past economic loss, $350,000 for past non-economic loss, and $407,000 in civil penalties); $1,035,243 for Pillarella ($228,243 for past economic loss, $400,000 for past non-economic loss, and $407,000 in civil penalties); $770,526 for Campell ($363,526 for past economic loss and $407,000 in civil penalties); $614,449 for Ramirez ($172,449 for past economic loss, $250,000 for past non-economic loss, and $192,000 in civil penalties); $849,870 for Camacho ($427,870 for past economic loss, $200,000 for past non-economic loss, and $222,000 in civil penalties); and $857,758 for Lackey ($375,758 for past economic loss, $75,000 for past non-economic loss, and $407,000 in civil penalties). A minute order stating the jury's verdicts incorrectly reflected $228,243 for Campbell's past economic loss; this was actually the amount of Pillarella's damages and was evidently included in the statement of Campbell's verdict due to a typographical error.

28

The jury also found all four defendants liable for punitive damages.  It ultimately imposed punitive damages of $5,000,002 against Zohoury, $8,999,998 against Rahimi, $3,500 against SBZ, and $3,500 against SIDMA, divided equally among the seven tenants.

On September 23, 2024, the court entered judgment consistent with the jury's verdict.

## I.     The Court Denies Defendants' Motion for JNOV and Conditionally Grants Their New Trial Motion on Damages

Defendants timely moved for a new trial and for JNOV.

On November 25, 2024, the court conditionally granted the motion for new trial as to damages, subject to the issuance of a remittitur, and denied the motion for JNOV.  As relevant here, the court concluded as follows in granting the new trial on damages.  Under SMMC part 4.36.100, relocation benefits were only recoverable where a city official had ordered relocation; if the ordinance was read not to require such an order, it was preempted by Health and Safety Code section 17975.1, which did require an order.  The city did not issue any relocation order (except for a 30-day period for which relocation benefits were paid), and thus the tenants could not recover relocation benefits.

A new trial was "further warrant[ed]" because the statutory damages and penalties awarded under Civil Code section 1940.2 and SMMC part 4.56.040 were excessive as the evidence did not show daily or continuous violations of the statute or ordinance during the construction.  In addition, the court (and not the jury) was responsible for assessing any penalty awarded under Civil Code section 1940.2, subdivision (b).  Furthermore, the tenants could not recover both statutory damages under SMMC part

29

4.56.040 and actual damages for the same conduct under other causes of action.  Punitive damages "overlapped" with the penalties awarded under Civil Code section 1940.2 and SMMC part 4.56.040 (for those tenants aged 65 or older) "constituting impermissible double punishment."  Even if the punitive damages and penalties may have been based on different specific conduct, the "[jury] instructions did not make clear that punitive damages could not cover conduct that was already the subject of [a] penalty" and "lack of instructions in this regard did not meet the due process requirement that a jury be advised of the circumstances under which they might award punitive damages."  Lastly, "even were the [c]ourt to strike the penalties, and leave the punitive damages, the punitive damages then would be at a ratio with compensatory damages exceeding that permitted as a matter of due process."  Given the reprehensibility of defendants' conduct, the ratio between punitive damages and compensatory damages "should be in the [one]-to-[one] to [two]-to-[one] range."  A lower ratio was warranted because the compensatory damages were " 'substantial' " and contained " 'a punitive element' " given that they included a "significant" award for emotional distress and statutory damages.  In addition, the "award of over $14 million in punitive damages seem[ed] to bear no rational relation to the actual harm suffered by [the tenants]," in part because "there was little evidence [that any exposure to lead and asbestos] directly caused them physical injury."

Pursuant to Code of Civil Procedure[9] section 662.5, subdivision (a)(2), the court issued a conditional order reducing

---

[9] Unspecified statutory references are to the Code of Civil Procedure.

the judgment to $9 million against Zohoury and Rahimi jointly and severally, with $4.501 million of that amount also against SBZ and SIDMA jointly and severally, divided among the tenants "in the same proportion as the [original] judgment." If the tenants accepted the remittitur within 20 days, then the motion for new trial would be denied.

The court denied the JNOV motion. It found, as relevant here, that the jury could have found Rahimi personally liable because "there was some evidence from which a jury could have found that Rahimi effectively managed or controlled [SBZ and 1647 OFLP], for purposes of Corporations Code [s]ec[tion] 15903.03, such that the [c]ourt cannot rule as a matter of law that he cannot be deemed the true principal, the corporate formalities notwithstanding."

The tenants accepted the reduction of damages on December 11, 2024, and the court accordingly denied the motion for new trial.

## J.    The Amended Judgment

The court entered an amended judgment on January 17, 2025, which awarded the tenants $4.5 million in "[c]ompensatory [d]amages and [p]enalties" against the four defendants jointly and severally,[10] $1,606,143 in punitive damages against Zohoury ($229,449 to each tenant), $2,892,856.96 in punitive damages against Rahimi ($413,265.28 to each tenant), $500 in punitive

---

[10] These damages were apportioned as follows among the tenants: $544,950 to Yin, $746,550 to Crosby, $804,600 to Pillarella, $598,950 to Campbell, $477,900 to Ramirez, $660,600 to Camacho, and $666,450 to Lackey.

damages against SBZ (roughly $71 to each tenant) and $500 in punitive damages against SIDMA (roughly $71 to each tenant).

The amended judgment also included awards of $3,209,160 in attorney's fees and $59,464.17 in costs in favor of the tenants.

## K.   The Parties' Appeals

Defendants filed timely notices of appeal as to the September 23, 2024 judgment, the November 25, 2024 "denial of motion for JNOV," the January 17, 2025 amended judgment, and the January 17, 2025 order awarding attorney's fees.[11]

The tenants filed a timely notice of cross-appeal on February 4, 2025, appealing the September 23, 2024 judgment, the November 25, 2024 order "conditionally granting defendants' motion for a new trial," and the January 17, 2025 judgment.

## DISCUSSION

The issues raised by the parties overlap in various ways. To avoid unnecessary repetition, we first address Zohoury, SBZ, and SIDMA's arguments regarding the tenants' use of the Board proceedings against them. We then address Rahimi's arguments that he should not be held liable. We address next the tenants' cross-appeal of the court's new trial order. We conclude by addressing Zohoury, SBZ, and SIDMA's arguments regarding the damages award against them.

---

[11] Zohoury, SBZ, and SIDMA do not address the attorney's fee award against them in their brief. Accordingly, we deem their challenge forfeited. (*Jogani v. Jogani* (2026) 118 Cal.App.5th 823, 839.) We address Rahimi's challenge in the Discussion, *post.*

## A. The Court Did Not Err in Applying Issue Preclusion as to Zohoury, SBZ, and SIDMA

Zohoury, SBZ, and SIDMA argue the trial court erred in giving the 20 Board findings preclusive effect.[12] Zohoury and SIDMA do not deny they were in privity with SBZ, who evidence showed owned the Property and was thus a party to the Board proceeding. Nor could they—there was evidence that SBZ owned the Property, SIDMA was SBZ's general partner, and Zohoury (along with his sister) owned SIDMA and held all of the interest in SBZ. There was also evidence that Zohoury controlled the defense of the Board proceeding, including retaining attorneys, personally appealing the hearing officer's decision, and being listed as a party in the Board's affirmance of that decision on appeal.

Zohoury, SBZ, and SIDMA instead argue (1) the Board proceeding involved different issues, burdens of proof, evidentiary standards, and available remedies; (2) the Board's hearing officer was not an impartial decisionmaker; (3) issue preclusion was inappropriate because there was a "limited" right to appeal the decision; and (4) applying issue preclusion was unfair because

---

[12] Zohoury, SBZ, and SIDMA advance these arguments by joining in ones made by Rahimi. We reject the tenants' contention that the defendants cannot do so. The tenants rely on *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, but in that case the Supreme Court criticized the practice of joining *all* arguments raised by another party and distinguished the situation, present here, where a party "identif[ied] with particularity the specific claims they wished to join." (*Id.* at p. 363)

defendants did not have sufficient incentive to litigate the Board proceeding.

### 1.    *Legal principles and standard of review*

Issue preclusion "precludes relitigation of issues argued and decided in prior proceedings." (*Lucido v. Superior Court, supra,* 51 Cal.3d at p. 341.)  It "applies (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 825.)  "The party asserting [issue preclusion] bears the burden of establishing these requirements." (*Lucido, supra,* at p. 341.)  In addition, courts must consider "the public policies underlying [issue preclusion]—preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation" before "appl[ying issue preclusion] in a particular setting." (*Id.* at p. 343; accord, *Gikas v. Zolin* (1993) 6 Cal.4th 841, 849.)

Issue preclusion is a legal question we review de novo. (*Smith v. ExxonMobil Oil Corp.* (2007) 153 Cal.App.4th 1407, 1415.)

### 2.    *The relevant factors weigh in favor of issue preclusion*

#### a.    Different issues, burdens of proof, evidentiary standards and remedies

Zohoury, SBZ, and SIDMA contend that the Board proceeding involved different issues than the lawsuit because the claims and remedies were different.  But "[t]he 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." (*Lucido v. Superior Court, supra,*

34

51 Cal.3d at p. 342; see also *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828 ["[issue preclusion] . . . may . . . preclude a party to prior litigation from redisputing *issues* therein decided against him, even when those issues bear on different claims raised in a later case"].) Here, the trial court applied issue preclusion to 20 findings made by the Board on specific issues which the court concluded were relevant to the lawsuit. Zohoury, SBZ, and SIDMA do not contend that any of the 20 findings was irrelevant to the lawsuit.

Zohoury, SBZ, and SIDMA also complain that the evidentiary rules applied in the Board proceeding were less formal than those governing civil litigation. This argument fails because issue preclusion can apply to administrative proceedings with less formal evidentiary rules such as the Board proceeding. "It is settled that the doctrine of . . . issue preclusion is applicable to final decisions of administrative agencies acting in a judicial or quasi-judicial capacity." (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 867; see *id.* at p. 866 [findings made by federal agency in determining a terminated employee's claim he was entitled to federal whistleblower protections were properly given issue-preclusive effect in the employee's later civil wrongful termination lawsuit]; see also *Imen v. Glassford* (1988) 201 Cal.App.3d 898, 908 [findings made in administrative real estate license revocation proceeding were properly given preclusive effect in a later civil fraud lawsuit].)

Zohoury, SBZ, and SIDMA lastly contend that the Board applied a different burden of proof in that, for repairs the Board deemed "upgrades"—as opposed to " 'reasonably necessary repair or maintenance to existing amenities or housing services' "—the tenant would be entitled to a rent reduction if they "prove[d] that

35

the work significantly impacted the habitability of their unit, interfered with the occupancy of their unit, or reduced or removed housing services for more than 24 hours," and "[did] not need to prove that the work was done in an unreasonable manner or took too long." But Zohoury, SBZ, and SIDMA fail to identify any of the 20 Board findings which established that construction at the Property was done in an unreasonable manner or took too long based on a presumption or failure of proof on the part of the landlord.

b. <u>Impartiality of the Board's hearing officer</u>

Zohoury, SBZ, and SIDMA contend that the Board's decision cannot be given preclusive effect against them because the Board's hearing officer was not "impartial." (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943.) We disagree. There is no evidence that the hearing officer was biased. Defendants rely solely on the fact that the hearing officer was a Board employee, but this circumstance did not render her biased. Zohoury, SBZ, and SIDMA cite *California DUI Lawyers Assn. v. Department of Motor Vehicles* (2022) 77 Cal.App.5th 517, 532, but in that case the hearing officer also represented the agency in the matter. Here, there is no evidence that the hearing officer advocated for or otherwise acted on behalf of the tenants. Each party to the Board proceeding had the opportunity to be represented by counsel or other individuals of their own choosing.

c. <u>Appellate rights</u>

Zohoury, SBZ, and SIDMA argue that it was error to apply issue preclusion to the Board's decision because appellate review of the decision "was limited." We are not persuaded.

Issue preclusion can be applied to decisions of administrative agencies, which are generally subject to more limited appellate review than civil cases. "For an administrative decision to have [preclusive] effect, it and its prior proceedings must possess a judicial character. [Citation.] Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision." (*Pacific Lumber Co. v. State Water Resources Control Bd.*, *supra*, 37 Cal.4th at p. 944.) In addition, "courts consider . . . the opportunity for judicial review of adverse rulings." (*Vandenberg v. Superior Court*, *supra*, 21 Cal.4th at p. 829.)

Witnesses at the Board proceeding testified under oath, and the parties could subpoena testimony and documents, cross-examine witnesses, introduce documentary evidence, and be represented by counsel. The hearings were transcribed and the hearing officer issued a detailed decision which was 134 pages in length not including attachments. There was a right of appeal from the hearing officer's decision to the Board, which Zohoury exercised.

After all this process, any aggrieved party could have sought judicial review by way of a petition for writ of administrative mandate under section 1094.5. (See *Ocean Park Associates v. Santa Monica Rent Control Bd.* (2004) 114 Cal.App.4th 1050, 1061 [describing scope of review in an administrative mandate proceeding challenging a Board decision reducing rent].) In deciding such a petition, the superior court

37

decides whether the Board acted without or in excess of jurisdiction, afforded a fair trial, and prejudicially abused its discretion.  (§ 1094.5, subd. (b).)  An abuse of discretion is shown if the agency did not proceed in the manner required by law, the decision is not supported by the findings, or the findings are not supported by the evidence.  (*Ibid.*)  In addition, a superior court's decision on such a petition can be appealed to the Court of Appeal, which " ' "must examine the findings made by the [agency] itself to determine whether they were supported by substantial evidence." ' "  (*Ocean Park Associates v. Santa Monica Rent Control Bd.*, *supra*, 114 Cal.App.4th at p. 1062.)  Such judicial review, including whether substantial evidence supported the Board's findings, is sufficient for issue preclusion purposes.  (See *People v. Sims* (1982) 32 Cal.3d 468, 480 [issue preclusion can be applied to Department of Social Services decision which was subject to judicial review through writ of administrative mandate].)

Defendants rely on *Vandenberg v. Superior Court*, *supra*, 21 Cal.4th 815, where our Supreme Court held that nonmutual issue preclusion could not be premised on an arbitration award, in part because of the very limited judicial review of arbitration decisions, which was "inherent in the nature of the arbitral forum as an informal, expeditious, and efficient alternative means of dispute resolution."  (*Id.* at pp. 831, 836-837.)  The court observed, "By choosing private arbitration, the parties 'evince [their] intent to bypass the judicial system and thus avoid potential delays at the trial and appellate levels.'  [Citation.] Judicial interference with the arbitrator's decision would thus defeat the very advantages the arbitral parties sought to achieve."  (*Id.* at p. 831.)  *Vandenberg* is distinguishable because

the scope of review of an arbitration award is, as noted by the court, very limited, whereas judicial review of the Board's decision via a petition for writ of administrative mandate encompasses consideration of whether the Board's findings were supported by substantial evidence, as well as whether the findings supported the Board's ruling.

Lastly, Zohoury and SIDMA's argument that since they were not parties to the Board proceeding they had no appellate rights is unavailing because SBZ, a party to the proceeding, had appellate rights. Plus, Zohoury himself *did* appeal to the Board. In any event, as long as Zohoury and SIDMA were in privity with SBZ (which they were), issue preclusion can apply if SBZ's appellate rights were adequate.

### d. Zohoury and SIDMA's incentive to fully defend the Board proceeding

Zohoury, SBZ and SIDMA contend that it is improper to give the Board's findings preclusive effect because they lacked sufficient incentive to vigorously defend against the Board proceedings. They rely on *Parklane Hosiery Co., Inc. v. Shore* (1979) 439 U.S. 322 [99 S.Ct. 645, 58 L.Ed.2d 552] (*Parklane*), where the United States Supreme Court held that issue preclusion should not be applied against a defendant where it would be "unfair," including when the first action involved "small or nominal damages" so that the defendant "may have [had] little incentive to defend vigorously, particularly if future suits [were] not foreseeable." (*Id.* at p. 330.)[13] It further held that trial

_____

[13] The *Parklane* court articulated this rule in the context of the "offensive" use of issue preclusion, i.e., where "a litigant who

39

courts should be "grant[ed] . . . broad discretion" to decide whether "the application of offensive estoppel would be unfair to a defendant" under the circumstances. (*Id.* at p. 331; see Rest.2d Judgments, § 28, com. j [a court can refuse to apply issue preclusion where "the amount in controversy in the first action [was] so small in relation to the amount in controversy in the second that preclusion would be plainly unfair" but "[s]uch a refusal to give the first judgment preclusive effect should not occur without a compelling showing of unfairness"].)

Here, it was not unfair for the trial court to give preclusive effect to the Board's 20 findings because the stakes in the Board proceeding were high enough to incentivize SBZ to defend its interest. If the tenants' rents were significantly reduced it would greatly decrease SBZ's stream of income from the Property. Evidence adduced at trial showed that Zohoury decided to go forward with renovations of the vacant units while the tenants were still residing at the Property because he felt the project could not afford to go without rental income. (See *Imen v. Glassford*, *supra*, 201 Cal.App.3d at p. 907 [the defendant in a

was not a party to a prior judgment [seeks to] use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." (*Parklane*, 439 U.S. at p. 326, fn. omitted.) Such "offensive" application of issue preclusion is not at issue here, where the tenants were party to the Board proceeding. We assume, without deciding, that the *Parklane* rule also applies where the plaintiff was also a party in the initial proceeding. (See *Roos v. Red* (2005) 130 Cal.App.4th 870, 880 [in case involving issue preclusion arising from prior litigation between the same parties, stating the *Parklane* rule regarding a defendant's possible lack of "incentive to vigorously litigate the issue in the prior action"].)

civil fraud lawsuit had sufficient motivation to oppose a prior administrative proceeding against his real estate license to support application of issue preclusion in the later fraud lawsuit].) Furthermore, the amount at issue was substantial. Ultimately, the Board awarded rent reductions totaling more than $338,000.[14] In addition, SBZ actively defended against the tenants' petitions. Zohoury personally attended some of the hearings and retained an attorney to appeal the hearing officer's decision to the Board. Lastly, it was foreseeable that the tenants would eventually sue the defendants, raising the distinct possibility that the prevailing side in the Board proceeding could later invoke issue preclusion. (See *Parklane*, *supra,* 439 U.S. at p. 332 [finding the defendants had sufficient incentive to defend against a prior lawsuit by the Securities and Exchange Commission in part because of "the foreseeability of subsequent private suits that typically follow a successful [g]overnment judgment"].)

Zohoury and SIDMA also contend they had no incentive to defend against the Board proceeding because they were not exposed to any personal liability in that proceeding. This argument conflates the concepts of privity and incentive to litigate. Zohoury and SIDMA do not contest they were in privity with SBZ. Thus, the issue is whether SBZ had sufficient incentive to defend against the tenants' rent reduction claims. We conclude it did for the reasons discussed.

---

[14] This includes rent reductions awarded to two individuals who rented units in the building but were not parties to the trial.

41

3. *Punitive damages*

Zohoury, SBZ, and SIDMA claim the trial court erred in allowing the Board's findings of fact, which were made on the basis of a preponderance of the evidence, to be binding for purposes of the tenants' claim for punitive damages, which required "[proof] by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) Issue preclusion "does not apply when the factual finding in the prior proceeding was arrived at based on a lower standard of proof than the one required in the subsequent proceeding." (*The Grubb Co., Inc. v. Department of Real Estate* (2011) 194 Cal.App.4th 1494, 1503.)

Defendants contend that most of the Board's findings tended to prove two factors relevant to punitive damages—the existence of physical harm, and indifference to or reckless disregard for the health and safety of others. The findings on which defendants focus stated that because of "the owner's" failure to test for asbestos and lead and to use proper construction practices, the tenants were "exposed to" "hazardous levels of" asbestos and lead dust which put them "at risk of respiratory and other ailments" and "interfered with the occupancy of their units." Noise and vibrations from the construction "was significant" and "affect[ed the tenants'] ability to sleep, concentrate and work, and sometimes [drove] them out of their units." "[D]ust and odors significantly affected tenants' ability to breathe and spend time in their units and negatively affected their health."

Zohoury, SBZ, and SIDMA have forfeited this challenge because they failed to seek a jury instruction on the subject. Defendants made a general argument to the court that it was

42

inappropriate for the Board's findings to be used to establish liability for punitive damages because of the different standards of proof, but they never sought an instruction explaining to the jury that it should use those findings only for purposes of determining liability for things other than punitive damages. As just discussed, the use of issue preclusion in determining liability for compensatory damages was proper. That the tenants also sought punitive damages did not mean that the Board findings became inadmissible for all purposes. If defendants believed the jury should not consider the Board findings in connection with punitive damages, they were obligated to seek an instruction saying so. " ' " ' "The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." ' [Citation.] ' "No procedural principle is more familiar to this Court than that a *constitutional* right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " ' " (*Keener v. Jeld–Wen, Inc.* (2009) 46 Cal.4th 247, 264.)

## B. Rahimi's Appeal

Rahimi raises issues about the sufficiency of the evidence supporting the judgment against him, including the application of issue preclusion as to him. He further claims error in certain jury instructions. We first analyze his issue preclusion claim and conclude it has merit on the issue of privity. Next, we consider his sufficiency claims and hold that insufficient evidence supports the liability findings against Rahimi for breach of lease, tortious breach of the warranty of habitability, menacing conduct in violation of Civil Code section 1940.2, relocation benefits under

SMMC part 4.36.100, IIED, and punitive damages. As to those claims, the court erred in denying Rahimi's JNOV motion and we remand for the trial court to grant judgment in his favor.

As to the remaining claims against Rahimi for negligence, nuisance, premises liability, and tenant harassment under SMMC part 4.56.040, we hold the evidence was sufficient to support liability but conclude the court prejudicially erred in instructing the jury regarding them. As to those four claims, we reverse for a new trial.

1. *Issue preclusion*

Rahimi makes the same arguments as Zohoury regarding issue preclusion, with the additional argument that Rahimi was not in privity with the owner of the Property, be it SBZ or 1647 OFLP.[15] As we have already addressed and rejected above the arguments against issue preclusion other than privity, we focus here solely on Rahimi's privity argument.

"As applied to questions of preclusion, privity requires the sharing of 'an identity or community of interest,' with 'adequate representation' of that interest in the first suit, and circumstances such that the nonparty 'should reasonably have expected to be bound' by the first suit. [Citation.] A nonparty alleged to be in privity must have an interest so similar to the party's interest that the party acted as the nonparty's ' " 'virtual representative' " ' in the first action." (*DKN Holdings LLC v. Faerber*, *supra*, 61 Cal.4th at p. 826.) We need not address

_____

[15] The Board concluded it was unclear whether SBZ or 1647 OFLP owned the Property due to conflicts in Zohoury's testimony and contradictory documents filed by Zohoury and Rahimi with the Board and other governmental entities.

44

whether Rahimi had " 'an identity or community of interest' " with either of the entities who potentially owned the Property (SBZ or 1647 OFLP) because, under the circumstances, Rahimi did not have a " ' "reasonable expectation" ' " he would be bound by the Board proceeding. (*Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 156.)

The Board proceeding addressed only the Property owner's right to receive rent from the tenants, not any of Rahimi's individual rights or obligations. " 'The "reasonable expectation" requirement is satisfied if the party to be estopped had a proprietary [or financial] interest in and control of the prior action, or if the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for the party to be estopped.' " (*Gottlieb v. Kest, supra*, 141 Cal.App.4th at p. 156.) Although Rahimi had a financial interest in the Board proceeding, the evidence did not establish that he personally controlled the defense. To the contrary, the evidence showed that Zohoury had control as he retained an attorney to represent the Property owner's interests during the proceeding, retained a separate attorney to pursue an administrative appeal, and appeared at and testified in the Board proceeding. Rahimi neither attended nor testified; although Westside employees did attend, they appeared as representatives of the Property owner and not Rahimi individually. Nor was the Property owner acting in a "representative capacity" for Rahimi in the Board proceeding. (*Ibid.*; compare *Lewis v. County of Sacramento* (1990) 218 Cal.App.3d 214, 218 [employer sought to be held vicariously

45

liable for employee's tort could "fairly be treated as acting in a representative capacity" for the employee].)[16]

2. *Substantial evidence*

a. Legal principles and standard of review

Rahimi contends that he is entitled to judgment in his favor on all claims because there was no substantial evidence to support liability against him. "In reviewing the sufficiency of evidence to support the jury's finding, we review the record in the light most favorable to the prevailing party, resolving in favor of the prevailing party all conflicts in either the evidence or the reasonable inferences to be drawn therefrom, to determine whether the record contains substantial evidence, contradicted or uncontradicted, supporting the finding. [Citations.] ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' [Citation.] 'The focus is on the quality, rather than the quantity, of the evidence.' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.' [Citation.] 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.] The testimony of a single witness may be sufficient." (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1045.)

---

[16] We need not decide whether the erroneous application of issue preclusion prejudiced Rahimi because, as discussed below, we conclude the judgment against him must be reversed on other grounds.

"Since the standard employed by an appellate court reviewing the sufficiency of the evidence is essentially the same as that used by a trial court considering a motion for . . . [JNOV] [citations], . . . [a] reversal of the judgment for insufficiency of the evidence effectively determine[s] that the trial court should have granted the [appellant's] motion for [JNOV]." (*Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 623-624.) Thus, where the trial court denies an appellant's motion for JNOV, "a reversal on appeal for insufficiency of the evidence concludes the litigation just as it would have been concluded if the trial court had correctly entered judgment notwithstanding the verdict." (*Id.* at p. 624.)

"[A] trial court may grant a motion for [JNOV] on some but not all issues or causes of action in a case." (*Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 332; accord, *Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 553.)

### b. Negligence and nuisance

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.] Recovery for negligence depends as a threshold matter on the existence of a legal duty of care." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213.) As to duty, Civil Code section 1714 provides, "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . ." (*Id.*, subd. (a).) Civil Code section 3479 defines a nuisance to include "[a]nything which is injurious to health . . . , or is indecent or offensive to the senses, or an

47

obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ."  Where a negligence claim based on the creation of a nuisance is viable, a nuisance claim is also viable.  (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1349.)

Rahimi argues that he could not be held personally liable for negligence because his only involvement in the Property was as an owner of Westside and a limited partner in 1647 OFLP.  This ignores that Rahimi could be held liable for his acts taken as an agent of Westside.  " ' "An agent or employee is always liable for his own torts, whether his employer is liable or not." ' [Citations.]  'In other words, when the agent commits a tort, . . . the agent [is] subject to liability in a civil suit for such wrongful conduct.' "  (*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 68.)  This concept applies to corporate officers, which "like any other employee, . . . individually owe a duty of care, independent of the corporate entity's own duty, to refrain from acting in a manner that creates an unreasonable risk of personal injury to third parties." (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 505; see *Michaelis v. Benavides* (1998) 61 Cal.App.4th 681, 686 [president, director, and stockholder of construction company could be held personally liable for negligence based on "his direct participation and decisionmaking in the construction of [a] patio and driveway"].)

Considered in the light most favorable to the tenants, there was evidence sufficient for the jury to conclude that Rahimi acted negligently by personally planning and directing the construction at the Property, which he knew might create a nuisance—that is, conditions indecent or offensive to the senses of the tenants who

48

would be staying at the Property during the construction, so as to interfere with the comfortable enjoyment of their units. Rahimi was personally involved in the construction and was aware of its scope. Zohoury testified that Rahimi "was in charge of construction and in charge of the building." Rahimi hired Majoros to prepare plans to remodel units at the Property and provided input on the plans. Rahimi also personally negotiated contracts for the construction work by Westin, Hugh Construction, and V10 Construction. Rahimi communicated with Zohoury, Majoros, Hohman, and the contractors concerning the construction.[17] During the construction Rahimi went to the Property "once in a while" and the tenants adduced evidence that unhealthy conditions at the Property, including dust, were evident. Rahimi was aware that the city had stopped construction in June 2014 due to problems with the construction, including the lack of asbestos testing. Zohoury testified that he and Rahimi decided to fire Westin because of his poor performance, failing to obtain permits, "and creating a lot of issues with the tenants," and that Rahimi communicated this to Westin. In addition, Rahimi testified that he recommended "to

---

[17] Rahimi acknowledges that he "generally had something to do at some point with the construction," but argues this cannot establish he individually owed any legal duty. We disagree for the reasons discussed. Rahimi relies on *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, but the court in that case held, "Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, *unless they participate in the wrong or authorize or direct that it be done*." (*Id.* at p. 595, italics added.) This is consistent with *Frances T. v. Village Green Owners Assn.*, *supra*, 42 Cal.3d at page 505, and the other cases cited above.

49

the owner" that the tenants be relocated during the construction, from which the jury could reasonably infer that he believed the construction would create unpleasant and possibly unhealthy conditions for the tenants.[18]

###### c. Premises liability

For the reasons just discussed regarding negligence and nuisance, there is also substantial evidence supporting the tenants' claim for premises liability against Rahimi personally. Premises liability requires that the defendant owed the plaintiff a legal duty of care based on ownership, possession, or control of property. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1162.) There is no evidence that Rahimi personally owned the Property or possessed it. But there is substantial evidence that Rahimi had some control over the Property through his control over the construction and exercised that control in ways that created unremediated dangerous conditions at the property sufficient to hold him individually liable.

###### d. Breach of lease and tortious breach of the warranty of habitability

No substantial evidence supports the tenants' claims against Rahimi individually for breach of the lease or tortious breach of the warranty of habitability. To prevail on those two

---

[18] To establish liability for negligence, as well as for premises liability and nuisance, the tenants were required to show that they were harmed and that each defendant's conduct caused the harm. Rahimi does not challenge the sufficiency of the evidence showing the construction created unpleasant and unhealthy conditions at the Property and that the tenants were harmed.

claims, the tenants had to adduce evidence they entered leases with Rahimi. (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186 [breach of lease]; *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 913 [tortious breach of warranty of habitability].) But the evidence at trial was that the tenants did not sign new leases when SBZ acquired the Property (or at any point after that) and the jury was instructed that in such a situation the owner of the Property became bound under the leases by operation of law. There is no substantial evidence that Rahimi ever signed any lease with any tenant, was assigned such a lease, assumed any obligations under a lease, or personally owned the Property.

> e. Menacing conduct under Civil Code section 1940.2

Civil Code section 1940.2 imposes liability only on "a landlord." (*Id.*, subd. (a)(3).) There was no substantial evidence that Rahimi was a "landlord" or owned the Property, and thus he could not be held liable under the statute. (*Otanez v. Blue Skies Mobile Home Park* (1991) 1 Cal.App.4th 1521, 1526 [concluding property manager could not be held liable under statute which "does not apply to persons other than landlords"].)

> f. Tenant harassment under SMMC part 4.56.040

SMMC part 4.56.020 prohibits "landlord[s]" from undertaking various types of conduct "in bad faith." Unlike Civil Code section 1940.2, however, the ordinance elsewhere provides that damages can be awarded against "[a]ny person who violates *or aids* or incites another person to violate" SMMC part 4.56.020. (SMMC, pt. 4.56.040, subd. (d), italics added.) Rahimi does not argue that there is no substantial evidence he aided the landlord in violating the ordinance. (See *Benach v. County of Los Angeles*

51

(2007) 149 Cal.App.4th 836, 852, fn. 10 [appellate court may "treat [an] issue as abandoned" where a party makes a "conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case"].)

        g.      <u>Relocation benefits under SMMC part 4.36.100</u>

In Santa Monica, "[a] landlord is required to provide temporary relocation benefits" under specified circumstances. (SMMC, pt. 4.36.100, subd. (a).) Rahimi contends he cannot be held liable under this ordinance because there is no evidence he was a landlord or owned the Property. The tenants respond that, under the ordinance's definition of "[l]andlord," Rahimi can be held liable as an "agent" or "representative" of the landlord.[19] (*Id*., pt. 4.36.010.) In particular, the tenants argue that Rahimi could be held liable under the theory he personally entered the management agreement and did not in fact assign it to Westside as he claimed.

The tenants did not argue at trial that Rahimi was liable for relocation benefits as a property manager.[20] Further, although there was evidence that Westside acted as the property manager, there was no substantial evidence that Rahimi personally acted as the manager with regard to any decision

---

[19] The ordinance defines "[l]andlord" as, "Any owner, lessor, sublessor, or any other person entitled to receive rent for the use and occupancy of a rental housing unit, or any agent, representative or successor of any of the foregoing." (SMMC, pt. 4.36.010.)

[20] In closing, the tenants argued the Property was titled in SBZ but "in reality" was owned by 1647 OFLP, which meant that Zohoury and Rahimi "both owned the property."

regarding relocation.[21]  Because there is no substantial evidence that Rahimi acted as an agent or representative of the landlord in this regard, no substantial evidence supports personal liability against Rahimi for relocation benefits.

> h.  IIED

"The elements of the tort for intentional infliction of mental distress are: (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of emotional distress." (*Stoiber v. Honeychuck*, *supra*, 101 Cal.App.3d at p. 921.)

Rahimi contends substantial evidence does not support the tenants' IIED claim because "there[ was] no evidence Rahimi intended to harm anyone . . . [¶] [n]or . . . that Rahimi knew that tenants were being harmed."  He points to his testimony that he was unaware of the tenants' complaints about the construction, was not involved in discussions with the city or in submitting plans, and assumed the "owner" tested for hazardous materials before undertaking construction.

As discussed above in connection with the negligence claim, there was substantial evidence that Rahimi was involved in planning the construction and was aware of what work would be done.  There was also substantial evidence that Rahimi was aware of the actual conditions at the Property during the construction resulting at least in part from his actions.  As discussed previously this evidence could support a conclusion

---

[21] The tenants point out that Rahimi signed construction contracts, but those contracts identified Westside as the contracting party.

53

that Rahimi was negligent, but it is not sufficient to support the conclusion that he acted with the intention to cause, or in reckless disregard of the probability of causing, emotional distress.

Among other things, there was no evidence as to when or how many times Rahimi went to the property during construction or what specific conditions he saw, or that he was aware of specific complaints by the tenants. There was no substantial evidence that he intended, or acted in reckless disregard of whether, the contractors would take inadequate precautions to avoid the release of hazardous substances or dust. There was no evidence that Rahimi was personally involved in obtaining permits for the construction, as was the case for Zohoury. There was no substantial evidence that Rahimi planned to use the construction to make life unpleasant for the tenants to induce them to terminate their tenancies, i.e., that he intended to harm the tenants.[22]

### i. Punitive damages

Rahimi contends there is no substantial evidence under the applicable clear and convincing evidence standard that he acted

---

[22] The tenants did adduce evidence that in April 2015 Zohoury signed escrow instructions to sell the Property without any tenants subject to the rent control law. The jury could infer that, in order to proceed with the sale, *Zohoury* would have to induce the tenants to move out very quickly, which might give him a motive to make conditions at the Property unpleasant. However, there was no evidence as to Rahimi's role in the proposed transaction or even that Rahimi was aware of it before Zohoury agreed.

with the state of mind required to establish liability for punitive damages.  We agree.

Under Civil Code section 3294, punitive damages can only be imposed based on clear and convincing evidence the defendant "has been guilty of oppression, fraud, or malice."  (*Id.*, subd. (a).) " 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.  [¶]  . . . 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.  [¶]  . . . 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  (*Id.*, subd. (c).)  "Under the clear and convincing standard, the evidence must be ' " ' "so clear as to leave no substantial doubt" ' " ' and ' " ' "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " ' "  (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1158.)

For the reasons just discussed with regard to the IIED claim, there was no substantial evidence meeting the clear and convincing threshold that Rahimi intended to cause injury to the tenants, or acted in conscious disregard of the tenants' safety or rights, sufficient to support a finding that he acted with malice or oppression.  Nor was there any evidence that Rahimi committed any fraud against the tenants.

The tenants do not identify any contrary evidence to support the jury's finding that Rahimi was guilty of malice, oppression, or fraud.  The tenants instead contend that the JNOV motion did not include a substantial evidence challenge to the

jury's verdict on liability for punitive damages, but this is not accurate.

3. *Erroneous jury instruction*

a. <u>Standard of review</u>

"A party may . . . challenge on appeal an erroneous instruction without objecting at trial." (*Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 7; *Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 296-297 [no appellate waiver when party did not object to a jury instruction containing " 'an incorrect statement of the law' "].)

"Instructional error is subject to a de novo standard of review. [Citation.] It is primarily a legal inquiry in which we need not give deference to the trial court's decision. [Citation.] 'Where it is contended that the trial judge gave an erroneous instruction,' we must 'view the evidence in the light most favorable to the claim of instructional error.' [Citation.] [¶] However, the giving of an erroneous jury instruction should not be disturbed unless, ' "after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." ' [Citation.] Instructional error is prejudicial in a civil case where ' " ' "it seems probable" that the error "prejudicially affected the verdict." ' " ' " (*Suffolk Construction Co., Inc. v. Los Angeles Unified School Dist.* (2023) 90 Cal.App.5th 849, 869-870.)

56

b.     Analysis

Rahimi contends the trial court erred in giving the jury a "nondelegable duty" instruction.[23]  The instruction stated that Rahimi, along with Zohoury, SBZ, and SIDMA, "[had] a duty that cannot be delegated to another person arising from the landlord-tenant relationship."  It further stated, "Under this duty, the landlord must maintain the premises intended for occupation of human beings in a condition fit for such occupation, and repair all subsequent dilapidations thereof, which render it untenantable."  It also stated that Rahimi and the other defendants were liable for the failure of their "employees, contractors and/or vendors . . . to properly maintain and repair the premises in violation of landlord's duty."

Rahimi argues this instruction was erroneous because he "was not a landlord" and "even if there were some set of facts whereby Rahimi might be deemed a landlord, the jury received no instruction as to what it would have to find to so conclude." (Italics omitted.)

We agree.  As relevant here, a landlord's nondelegable duty is based on the rule that a property owner owes a nondelegable duty to maintain the property in a reasonably safe condition and can thus be held liable when his independent contractor is negligent in maintaining or repairing the property.  (*Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 726.)  As to

_____

[23] Rahimi also contends the court erred in giving an instruction relating to the liability of a general partner without clarifying the protections against liability afforded to a limited partner.  In ruling on the JNOV motion, the court acknowledged this error.  We need not address this claim because the nondelegable duty instructional error alone mandates reversal.

57

Rahimi, the instruction at issue was erroneous because it established Rahimi himself was a "landlord," i.e., owned the Property, when there was no evidence to support such a conclusion. Viewing the evidence in the light most favorable to Rahimi's challenge, SBZ or 1647 OFLP owned the Property, not Rahimi. Furthermore, Rahimi held no interest in SBZ, which was a limited partnership with SIDMA being the general partner and Zohoury a limited partner; Rahimi did have an interest in 1647 OFLP but only as a limited partner. Rahimi was the sole shareholder of Westside, which managed the Property but held no ownership interest in the Property itself.

The tenants do not argue that the nondelegable duty instruction was proper. They contend only that Rahimi forfeited his challenge by failing to object in the trial court. This argument fails because, as already noted, a party can challenge on appeal an instruction as legally erroneous without objecting to it in the trial court, and the instruction at issue was in fact legally erroneous as to Rahimi.[24]

It was reasonably probable that, had the jury not been improperly instructed Rahimi was a landlord, it would have reached a different verdict. First, the 20 Board findings involved the "owner" of the Property, meaning the jury likely considered them established against Rahimi individually based on the erroneous instruction even though he was not an owner. The other evidence, viewed most favorably to Rahimi, showed that

_____

[24] The tenants assert that the challenged instructions "stated the law correctly" and refer to another section of their brief, but that section does not address the nondelegable duty instruction.

Zohoury was in charge of the Property and Rahimi's role was to assist and implement Zohoury's decisions. Rahimi testified, "[i]t was not [his] decision" to demolish and renovate the vacant units and he was following Zohoury's directions. The scope of the construction work "[had] to be confirmed with the ownership," which was SBZ and Zohoury. Rahimi recommended "to the owner" that all of the tenants be relocated during the construction. However, being instructed that Rahimi was an owner likely suggested to the jury that Rahimi was responsible for such decisions, or that he was being untruthful about Zohoury having more responsibility.

Furthermore, it is reasonably probable the erroneous nondelegable duty instruction prejudicially affected the jury's verdicts on the tenants' claims for negligence, nuisance, premises liability, and violation of SMMC part 4.56.020. There is a reasonable probability the erroneous instruction prejudicially affected the verdicts for nuisance, negligence, and premises liability because the jury was instructed that Rahimi personally owed a duty of care with respect to the conditions at the Property and, in addition, that he was vicariously liable for the negligent conduct of those who did the construction work.

SMMC part 4.56.020 prohibits various types of conduct undertaken by a "landlord . . . in bad faith." Although the jury was instructed, consistent with the ordinance (*id.*, pt. 4.56.040, subd. (d)), that "any person who violates or aids or incites another person to engage in tenant harassment as defined in [the ordinance]" could be held liable for the specified damages, it is reasonably probable the erroneous instruction that Rahimi was a landlord was prejudicial. Even if the verdict on this claim was not tainted by the erroneous jury instruction, reversal of the

59

judgment is required because it is not possible to separate out any damages awarded under this theory given the structure of the verdict form. (*Bevis v. Terrace View Partners, LP* (2019) 33 Cal.App.5th 230, 262 [reversal was required where the court "[could not] conclude the entire award of compensatory damages reasonably could have been based on a viable legal theory"].)

### 4. *Attorney's fees*

Because we reverse the judgment as to Rahimi, we also reverse the order awarding attorney fees as against him. (*California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 220 [order awarding attorney fees " 'falls with a reversal of the judgment on which it is based' "].)

## C. The Tenants' Appeal

The tenants contend the trial court abused its discretion in ordering a conditional new trial on excessive damages as to all defendants because (1) it erroneously concluded that relocation damages were recoverable under SMMC part 4.36.100 only after relocation had been ordered by the city, (2) there was no instructional error as to Rahimi's liability, (3) the compensatory damages were not excessive because substantial evidence supported damages under SMMC part 4.56.040 and penalties under Civil Code section 1940.2, and (4) the punitive damages awarded were not excessive because the award was not duplicative of the penalties and non-economic damages and the ratio between punitive and compensatory damages was constitutional.

### 1. *Legal principles and standard of review*

A trial court may grant a motion for new trial for any of the grounds listed in section 657 materially affecting the substantial

rights of a party.  As relevant here, those grounds include "[e]xcessive or inadequate damages," "[i]nsufficiency of the evidence to justify the verdict . . . or the verdict . . . is against law," and "[e]rror in law, occurring at the trial and excepted to by the party making the application."  (§ 657.)  "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated."  (*Ibid*.)

"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.  This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter.  So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside."  (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387.)  "In sharp contrast to appellate considerations of a claim of excessive damages on a cold record, the trial court 'see[s] and hear[s] the witnesses' and can ascertain for itself 'the injury and the impairment that has resulted therefrom.'  [Citations.]  Accordingly, when a trial court grants a new trial on the issue of excessive damages, whether or not the order is conditioned by a demand for reduction, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order.' "  (*Pearl v. City of Los Angeles* (2019) 36 Cal.App.5th 475, 485-486.)

"An order granting a new trial must be affirmed on appeal if a new trial 'should have been granted upon any ground stated

61

in the motion, whether or not specified in the order or specification of reasons,' except that an order can be affirmed on the ground of insufficiency of the evidence to justify the verdict or excessive or inadequate damages only if such ground was stated in the order and can be affirmed on those grounds only for the reasons specified in the order or specification of reasons." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1121, quoting § 657.)

2. *The trial court did not err in concluding damages were excessive*

The trial court did not err in concluding that the jury awarded excessive damages and penalties under SMMC part 4.56.040 and Civil Code section 1940.2. Because this is sufficient to affirm the new trial order given the general verdict, we do not discuss the tenants' other arguments.

The tenants asked the jury to find defendants violated SMMC part 4.56.040 and Civil Code section 1940.2 every day during two periods of construction (1) beginning in January 2014 and lasting 1,111 days (approximately 37 months), and (2) beginning in October 2019 and lasting 344 days. The tenants asked the jury to multiply the statutory damages and penalties for tenant harassment by 1,455 days, the total of these two periods. The court found that the jury awarded such damages and penalties for the total period of construction. Substantial evidence supports this conclusion. The award of "[p]enalties" for each tenant was a multiple of 37—the number of months in the first period of construction argued by the tenants. The lone exception was Ramirez, who was not residing at the Property for the first five months of that period, and her award was divisible by 32, i.e., the number of months in the first construction period

when she was residing at the Property. Furthermore, each tenant aged under 65 was awarded penalties of $6,000 times 37 (or 32 for Ramirez), while the four tenants aged 65 or over (Crosby, Pillarella, Campbell, and Lackey[25]) were awarded $11,000 times 37, which is consistent with their being awarded 37 times the sum of $6,000 (consistent with the awards to the other tenants) and the "[a]dditional civil penalty of $5,000" under SMMC part 4.56.040.

The court concluded that such an award was excessive because "[t]here was no evidence offered of a continuing violation of the statute and ordinance or that there was an ongoing daily *violation* for the two time[ ]periods, even if there was continuing impact from [d]efendants' wrongful conduct." The court also concluded that the tenants "recovered actual damages based on the same conduct they asserted was based on harassment (by way of conduct that was the basis for other causes of action[])."

The tenants argue the court's finding was error because there was "substantial evidence of ongoing and wholly unnecessary construction that rendered the property uninhabitable for over four years." This argument fails because SMMC parts 4.56.020 and 4.56.040 together impose liability for specific instances of *conduct*, not ongoing conditions resulting from that conduct. Substantial evidence supports the trial court's conclusion that the evidence adduced at trial did not show that defendants engaged in acts of "bad faith" conduct under SMMC part 4.56.020 or "menacing conduct" under Civil Code section

_____

[25] Lackey turned 65 in 2017.

1940.2, subdivision (a)(3) on each and every day of the construction periods.[26]

Substantial evidence also supports the trial court's finding that the tenants' recovery of damages under SMMC part 4.56.040 duplicated the damages they recovered under other claims. (See *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158 [a plaintiff "is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence"].) One basis for recovery under the ordinance was "[i]nterfere[nce] with a tenant's right to quiet use and enjoyment of a rental housing unit"[27] (SMMC, pt. 4.56.020, subd. (j)), and damages awarded under this theory would duplicate whatever damages the tenants recovered for discomfort and annoyance under their nuisance claim or overlap with the amounts they recovered for emotional distress under their other claims, such as negligence.

---

[26] The cases the tenants rely upon are inapposite. In both *People v. Braum* (2020) 49 Cal.App.5th 342, 350, footnote 11, 354 and *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1308, 1310, the trial courts imposed daily civil penalties on the defendants based on ordinances which expressly provided for daily penalties. In *People v. Overstock.com. Inc.* (2017) 12 Cal.App.5th 1064, the trial court imposed daily civil penalties for the defendant's use of untrue and misleading advertising statements on its website based on its finding that separate violations occurred every day. (*Id.* at pp. 1074, 1087-1088; see *id.* at p. 1088 ["the offending practices were numerous and persistent in that they occurred daily, on thousands of product pages"].)

[27] This was one of the two bases for liability under SMMC part 4.56.040 the tenants focused on in their closing argument.

3. *The new trial order complied with the requirements of section 657*

The tenants contend we must reverse because the court's new trial order failed to provide the information required by section 657 concerning the reasons for the order. We disagree.

"When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." (§ 657.) " 'The statement of "reasons" . . . should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation.' [Citation.] ' "[T]he trial judge is not necessarily required to cite page and line of the record, or discuss the testimony of particular witnesses," nor need he [or she] undertake "a discussion of the weight to be given, and the inferences to be drawn from each item of evidence supporting, or impeaching, the judgment," ' but the 'trial judge [is required] to briefly identify the deficiencies he [or she] finds in "the evidence" or "the record" or [citation] "the proof"—rather than merely in "the issues" or "the ultimate facts." ' " (*King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 716.)

The new trial order satisfies this standard. The order contained a lengthy analysis which separately addressed each of the court's reasons for granting a new trial and thoroughly articulated the legal and evidentiary bases for those reasons sufficient to facilitate appellate review. The tenants assert, "the court did not set forth witnesses the court believed or disbelieved, what testimony it disregarded or the value of any impeachment," but such specific evidentiary issues were not implicated in the court's reasons for granting a new trial. We reject the tenants'

65

unsupported assertion that the trial court failed to explain why it found the evidence insufficient to support damages; the order adequately explains the court's reasoning.

Lastly, the tenants contend that the trial court did not adequately explain how it arrived at the reduced damages it incorporated into the remittitur, but this does not affect the adequacy of the court's order granting a new trial. (*Schelbauer v. Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 455 ["[t]he invalidation of the conditional remittitur does not . . . invalidate the trial court's [new trial] order"].)

## D. Zohoury's Appeal on Damages

Zohoury, SBZ, and SIDMA contend that we should reverse the amended judgment as to them and order a new trial on damages because the amended judgment is inconsistent with the trial court's new trial order in that it includes elements of damage which the trial court had ruled were improper.[28]

As authorized by section 662.5, subdivision (a)(2), the trial court made its new trial order subject to the condition that the motion would be denied if the tenants consented to an amended judgment in a reduced amount which the court independently determined was "fair and reasonable." As stated in the order, "the total amount of [the amended judgment would be] $9 million, as against Zohoury and Rahimi, jointly and severally, to be divided between the different [p]laintiffs in the same proportion as the [original] judgment, and in the total amount of

_____

[28] Rahimi also challenges the damages awarded in the trial court's amended judgment. His arguments are moot in light of our conclusions that Rahimi is entitled to judgment on several claims and a new trial on the remaining claims.

$4.501 million, as against SBZ and SIDMA, jointly and severally, to be divided between the different [p]laintiffs in the same proportion as the [original] judgment."

As relevant here, the court's order explained that the tenants were entitled to the same amount of noneconomic damages as included in the original judgment and defendants were liable for punitive damages. It further explained, "Even if civil penalties were still allowed, the punitive damages would have to reflect that it was not for the conduct that was already the subject of penalties. Plaintiffs cannot recover statutory damages as well as actual damages for the same conduct covered by the SMMC. . . . [I]njury from unlawful intent to force tenants to vacate cannot be sought as a civil penalty and as harassment as statutory damages."

As to Zohoury, SBZ, and SIDMA, the court eventually entered an amended judgment which awarded the tenants a total of $4.5 million as "[c]ompensatory [d]amages and [p]enalties" against the defendants jointly and severally, as well as punitive damages of $1,606,143 against Zohoury and $500 each against SBZ and SIDMA.[29]

1.   *Applicable legal principles and standard of review*

A court exercising its authority under section 662.5, subdivision (a)(2) "acts as an independent trier of fact." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 688.) " '[W]here the trial court has required a remission as a condition

---

[29] Correcting its error in the new trial order, the trial court made defendants' liability for punitive damages severable; the punitive damages were apportioned in equal shares among the tenants.

67

to denying a new trial "a verdict is reviewed on appeal as if it had been returned in the first instance by the jury in the reduced amount." ' " (*West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 877.)

2. *Analysis*

Zohoury, SBZ, and SIDMA contend that the amended judgment is inconsistent with the trial court's reasons for granting a new trial. We disagree.

The trial court ruled as follows: the tenants could not recover damages for relocation benefits under SMMC part 4.36.100; the damages awarded for tenant harassment under SMMC part 4.56.040 and the civil penalties awarded under Civil Code section 1940.2 were excessive; the tenants could not recover both statutory damages under SMMC part 4.56.040 and damages under other claims "based on the same conduct"; punitive damages "overlapped" with the civil penalties awarded under Civil Code section 1940.2 and SMMC part 4.56.040 (for those tenants aged 65 or older), and to the extent the punitive damages and penalties were based on the same conduct the tenants could not recover both.

Zohoury, SBZ, and SIDMA contend that the trial court must have included in the amended judgment some amount for civil penalties or "a combination of actual and statutory damages," which was inconsistent with the court's new trial order. We agree as a matter of arithmetic that the amended judgment necessarily includes some civil penalties, a combination

of actual and statutory damages, or both.[30]  We disagree, however, that this is inconsistent with the new trial order.  The order permitted penalties under Civil Code section 1940.2 and SMMC part 4.56.040 (for those tenants aged 65 or over) in addition to punitive damages as long as the awards were based on different conduct.[31]  Similarly, the order permitted both an award of statutory damages under SMMC part 4.56.040 and actual damages as long as the two types of damages were not "based on the same conduct."

The trial court could have reasonably concluded that the conduct supporting the penalties did not completely overlap with the conduct supporting punitive damages because the applicable standards differ.  Punitive damages must be supported by clear and convincing evidence of malice or oppression.  (Civ. Code, § 3294, subds. (a), (c)(1) & (2).)  In contrast, penalties are

---

[30] As Zohoury points out, the amended judgment was to include $1,525,000 in noneconomic damages (the same amount as in the original judgment), which means that the total amount of damages awarded not including noneconomic and punitive damages was $2,975,000.  The original judgment included a lower total amount ($2,000,939) for "past economic loss," so some damages included in the original judgment under the "[p]enalties" category must have been included in the amended judgment since the original judgment included only the four categories: "[p]enalties," "past economic loss," noneconomic, and punitive.

[31] The trial court held that civil penalties under Civil Code section 1940.2 were to be determined by the court, not by the jury.  Thus, in calculating damages for the amended judgment we infer the trial court determined itself what civil penalties should be included under the statute.

recoverable under Civil Code section 1940.2, subdivision (a)(3) for "menacing conduct" to "influenc[e] a tenant to vacate," and under SMMC part 4.56.040 for various types of "bad faith" conduct, including "[i]nfluenc[ing] or attempt[ing] to influence a tenant to vacate a rental housing unit through fraud, intimidation or coercion" (*id.*, pt. 4.56.020, subd. (f)) and "[i]nterfer[ing] with a tenant's right to quiet use and enjoyment of a rental housing unit" (*id.*, subd. (j)). Thus, the awards of punitive damages could have been at least partially based on different conduct than were the awards under Civil Code section 1940.2 and SMMC part 4.56.040.

The court also could have reasonably concluded that the conduct underlying the statutory damages did not completely overlap with the conduct supporting actual damages under other claims. For example, statutory damages awarded for "[i]nfluenc[ing] or attempt[ing] to influence a tenant to vacate a rental housing unit through fraud, intimidation or coercion" (SMMC, pt. 4.56.020, subd. (f)) would not necessarily be based on the same conduct supporting actual damages under other claims.

Zohoury, SBZ, and SIDMA also contend "it is obvious that the new compensatory damages award is likely to include some undetermined amount of improper relocation expenses." We disagree. The amount included in the amended judgment for "[c]ompensatory [d]amages and [p]enalties" is fully supported by damages recoverable under the other theories the trial court concluded were valid, and nothing in the amended judgment suggests the trial court included a recovery for relocation benefits despite finding it was contrary to law. Defendants fail to show

that the amended judgment must have included relocation benefits.[32]

Defendants' reliance on *Bevis v. Terrace View Partners, LP*, *supra*, 33 Cal.App.5th 230 is misplaced. *Bevis* held that a judgment must be reversed where a portion of an unsegregated award is clearly for an improper form of compensatory damages (*id*. at p. 262), but Zohoury, SBZ, and SIDMA have not shown the amended judgment includes any improper damages.

Lastly, Zohoury, SBZ, and SIDMA argue that the amount of punitive damages in the amended judgment must be re-evaluated if we conclude the court included improper compensatory damages in the amended judgment. Because the trial court did not err in the amount of compensatory damages it included in the amended judgment, this argument fails.

---

[32] Zohoury contends it is unclear from the trial court's new trial order how the $9 million total award was broken down into compensatory and punitive damages. Not so. The order set forth different amounts of total damages as to Zohoury/Rahimi and SBZ/SIDMA, and the difference could only be explained by different punitive damage awards. In addition, the punitive damage awards against SBZ and SIDMA were to remain the same. This means the compensatory damages could be calculated at $4.5 million by subtracting the punitive damages against SBZ and SIDMA from the total award against them. The court acknowledged that its order had included incorrect punitive damages awards against SBZ and SIDMA. The awards should have been $3,500 each but the order reflected only $500 each; ultimately, the court left the lower amounts in the amended judgment.

## DISPOSITION

The amended judgment is affirmed as to Zohoury, SBZ, and SIDMA. The trial court's order denying Rahimi's motion for JNOV is reversed as to the tenants' claims for breach of lease, tortious breach of the warranty of habitability, violation of Civil Code section 1940.2, violation of SMMC part 4.36.100, IIED, and punitive damages; the trial court is instructed to grant the motion as to those claims. The JNOV order in all other respects is affirmed. Judgment against Rahimi on the remaining claims against him as well as for attorney's fees and costs as against him is reversed for a new trial. Each party is to bear its own costs in this appeal.

NOT TO BE PUBLISHED

                                                            WEINGART, J.

We concur:


            BENDIX, Acting P. J.



            M. KIM, J.

72

# APPENDIX

## BOARD FINDINGS AS TO WHICH ISSUE PRECLUSION APPLIED

1. "Testing for and remediation of asbestos, lead and mold were required at various times as part of the construction."

2. "Despite the major work starting in January 2014, the owner did not test for asbestos until June 23, 2014 and the Air Quality Management District ordered the owner to stop work and hire a certified asbestos consultant to test for asbestos in Units 2, 3, 5, 6, 10, 12 and any other units in which renovations had taken place."

3. "The asbestos was not cleared until July 11, 2014 and the disturbing of asbestos was caused by unnecessary upgrades to the vacant units and common areas rather than by necessary repairs or maintenance."

4. "The tenants were exposed to asbestos that was not properly contained, handled or disposed of and put the tenants at risk of respiratory and other ailments."

5. "The tenants' exposure to hazardous levels of asbestos resulted from the owner's failure to obtain permits to test for asbestos and to use safe work practices."

6. "The tenants' exposure to asbestos significantly impacted the habitability of their units and interfered with the occupancy of their units.

7. "The owner did not conduct testing for the presence of lead until July 1, 2014."

8. "The owner's expert . . . tested every unit and the common areas, both interior and exterior. The dust [wipe] survey found . . . 'dangerous levels of lead dust' . . . in various units and common areas and recommended remediation and decontamination. The lead bulk survey also found lead-based paint and dangerous levels of lead-bearing substances in various units and common areas and recommended remediation and decontamination."

9. "Lead testing was done again on May 28, 2015 by the [Los Angeles] County Public Health Department [(County Health)] based on a complaint by tenants. Dust samples were again found to contain hazardous levels of lead although no hazardous levels were found in soil or deteriorated paint. Dust hazards were found in vacant Unit 2 and in the first floor hallway. After cleaning, the Unit 2 interior . . . floor . . . failed clearance and the owner was ordered to clean it again. Clearance was passed the second time and the complaint was closed on August 13, 2015."

10. "In September[] 2015 the county received another complaint about unsafe lead work practices causing extensive dust in the building. An inspector observed visible dust in the common areas and took samples from the common areas and from all the occupied units. Testing showed dust hazards above the regulatory limit in Unit 16."

11. " 'County Health found that renovation activities are conducted unsafely without the required containment and worker protection and occupant protection[]' . . . . They required Mr. Zohoury to attend an office hearing, which is part of a progressive enforcement process that can ultimately lead to criminal charges."

2

12. "John Guerrero of Building and Safety found construction work had been started without any testing for lead. Improper practices had been followed. The owner would have needed clearance from County Health before demolishing the vacant units and peeling the surface off the hallway walls."

13. "The owner's failure to test for lead and to use lead-safe work practices, LSWP, put tenants at risk. The contractor did not use LSWP to remove or dispose of the paint that was disturbed in the vacant units and the hallways prior to testing."

14. "The negative impacts of the lead dust was significant. The dust put the adult tenants at risk of respiratory and other ailments. The lead dust was caused by unnecessary upgrades to the vacant units and common areas rather than by necessary repairs or maintenance. The tenants' exposure to hazardous levels of lead dust resulted from the owner's failure to obtain permits, to test for lead and to use lead-safe work practices."

15. "The tenants' exposure to lead dust significantly impacted the habitability of their units and interfered with the occupancy of their units."

16. "The health effects from the construction significantly impacted the habitability of their units and interfered with the occupancy of their units."

17. "The negative impact of noise and vibration on the tenants was significant, affecting their ability to sleep, concentrate and work and sometimes driving them out of their units. The noise and vibrations significantly impacted the habitability of their units and interfered with occupancy of their units."

3

18.     "The dust at the property was primarily generated by the work in the common area hallways and by the demolition of the eight vacant units."

19.     "The new limestone floors in the hallways are higher than the floors inside the tenants' units.  No threshold or other edging had been installed to bridge this gap.  As a result, construction dust from the hallways blows under their doors and into their units."

20.     "The dust and odors significantly affected the tenants' ability to breathe and spend time in their units and negatively affected their health.  The dust impacted and continued to impact the tenants from June 30, 2014 through the completion date of the construction."